# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA

*Plaintiff,*

vs.

Case No. 18-10099-EFM-KGG-1

BRADLEY A. PISTOTNIK,

*Defendant.*

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendant Bradley Pistotnik's Motion for Reconsideration of the Magistrate Judge's Memorandum and Order granting in part and denying in part a motion to quash that was filed by nonparties Xcentric Ventures, LLC ("Xcentric") and Chandler Automated Systems ("Chandler"). For the reasons the Court explains below, Pistotnik's Motion for Reconsideration (Doc. 71) is granted in part and denied in part.

### I.  Factual and Procedural Background

The Government alleges that Pistotnik, together with his co-defendant, David Dorsett, threatened to cause damage to Xcentric's computer systems by targeting a website Xcentric owns and operates: www.Ripoffreport.com ("Ripoffreport").[1]  Ripoffreport allows consumers to post

---

[1] The Indictment alleges 10 Counts total. Count 1 alleges that Dorsett and Pistotnik threated the computer systems of Leagle.com ("Leagle")—an entity that has no interest in the matter now before the Court. Counts 2 and 4 relate to the threats against Ripoffreport. Counts 3 and 5 relate to threats against the law offices of Jaburg Wilk, Ripoffreport's legal counsel. Counts 6 and 7 allege that Dorsett and Pistotnik conspired to commit the crimes alleged

anonymous reports detailing ways in which they have been wronged by different businesses. Ripoffreport has a general policy against releasing its users' identities and against removing any of the posted reports from its site.

Sometime around September 2014, a negative report about Pistotnik ("the Report") was posted to Ripoffreport. The Government alleges that Pistotnik and Dorsett sent Ripoffreport threatening messages via an "email bomb"—a large quantity of emails designed to overwhelm the recipient's digital infrastructure—stating that if Ripoffreport removed the Report from its site, the onslaught of emails would end. But if the Report was not removed, the harassing emails would continue and Ripoffreport's advertisers would also be targeted. The first "email bomb" attack was sent in September 2014, and Ripoffreport capitulated to the sender's demands by removing the Report from its site. Within months, the Report was reposted to Ripoffreport. In July 2015, Ripoffreport was bombarded with a second series of threatening emails.

After the Government brought its charges, Pistotnik served subpoenas duces tecum on Xcentric and Chandler, a company providing cyber security and IT services to Xcentric. Pistotnik's subpoenas requested documents relating to, among other things, the Report's authorship, Xcentric's damages from the attack, and Xcentric's cyber-defense infrastructure. In total, the subpoena to Xcentric included 15 paragraphs of subpoenaed documents, and the subpoena to Chandler included eight paragraphs of subpoenaed documents. Before serving his subpoenas, Pistotnik filed a motion seeking authorization to serve his subpoenas on Xcentric and Chandler, as well as on other parties. This Court contacted Pistotnik's counsel by phone and

---

in Counts 1-5. Counts 8-10 apply only to Pistotnik and allege that Pistotnik provided false statements to the FBI in an interview discussing the events related to Counts 1-7.

informed him that he did not need the Court's further permission to issue the subpoenas;[2] the Court subsequently entered an order denying Pistotnik's motion as moot.

Xcentric and Chandler filed a motion to quash both subpoenas. That motion was referred to the Magistrate Judge assigned to the case, who granted it in part and denied it in part. Pistotnik's Motion for Reconsideration now before the Court requests review of the Magistrate Judge's order. On May 6, 2019, the Court heard oral argument on Pistotnik's Motion. At this hearing, Pistotnik informed the Court that he was withdrawing any objection to the Magistrate Judge's order granting the motion to quash Paragraphs 3 and 6–8 in the Xcentric Subpoena. Pistotnik maintained his objections to the Magistrate Judge's order granting the motion to quash Paragraphs 1, 2, and 9–15 of the Xcentric subpoena and Paragraphs 1–8 of the Chandler subpoena.

## II.     Legal Standard

The Court reviews the Magistrate Judge's order under a clearly erroneous standard. Pursuant to Fed. R. Crim. P. § 59(a):

> A district judge may refer to a magistrate judge for determination any matter that does not dispose of a charge or defense. The magistrate judge must promptly conduct the required proceedings and, when appropriate, enter on the record an oral or written order stating the determination. A party may serve and file objections to the order within 14 days after being served with a copy of a written order or after the oral order is stated on the record, or at some other time the court sets. The district judge must consider timely objections and modify or set aside any part of the order that is *contrary to law or clearly erroneous*. Failure to object in accordance with this rule waives a party's right to review. (Emphasis added).

---

[2] The Court concedes that this process was not technically correct under the circumstances and created some confusion in the case.

## III. Analysis

In *United States v. Nixon*,[3] the Supreme Court held that to obtain documents under a Rule 17 subpoena, the party seeking the documents must demonstrate:

> (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general fishing expedition.[4]

Put another way, three obstacles must be overcome before issuing a subpoena under Rule 17: relevancy, admissibility, and specificity.[5] A party that has been served a subpoena may move the court "[to] quash or modify the subpoena if compliance would be unreasonable or oppressive."[6] Additionally, "a subpoena requiring the production of personal or confidential information about a victim may be served on a third party only by court order."[7]

Here, Pistotnik raises several objections to the Magistrate Judge's order partially granting the motion to quash Pistotnik's subpoenas served on Xcentric and Chandler. The gravamen of Pistotnik's Motion is his objection to the Magistrate Judge's holding that the identity of the Report's author is not relevant under *Nixon*. Pistotnik also argues that the Magistrate Judge erred in holding that information about Xcentric's cyber-defenses is not relevant under *Nixon*. Finally, Pistotnik objects to the Magistrate Judge's conclusion that Pistotnik disregarded Rule 17's

---

[3] 418 U.S. 683 (1974).

[4] *Id.* at 699-700.

[5] *Id.* at 700.

[6] Fed. R. Crim. P. § 17(c)(2).

[7] Fed. R. Crim. P. § 17(c)(3).

requirement that he obtain Court permission prior to serving his subpoenas, arguing that this misunderstanding permeates the Magistrate Judge's order and resulted in the court quashing significant portions of both subpoenas that would otherwise have been allowed.

**A.   Relevance of the Report's authorship**

Pistotnik objects to the Magistrate Judge's determination that Paragraphs 1 and 2 of the Xcentric subpoena—seeking documents concerning the Report's authorship[8]—failed to overcome *Nixon*'s relevancy hurdle. Pistotnik makes the initial argument that the Magistrate Judge's relevancy standard was impermissibly high. Pistotnik then provides two ways in which the Report's authorship should be deemed relevant. First, assuming Pistotnik's co-defendant Dorsett is the author of the Report, Pistotnik would introduce "Reverse 404(b)" evidence against Dorsett. Second, Pistotnik would use the authorship of the Report to impeach Dorsett's testimony.

   *1.   Relevancy standard*

Pistotnik argues that the Magistrate Judge improperly held that evidence is only relevant if it would serve as an absolute defense to the crimes charged. The Court disagrees with this characterization of the Magistrate Judge's order. The Court reads the Magistrate Judge's order as stating that regardless whether Dorsett authored the Report, baited Pistotnik into committing the crime, or solicited Pistotnik's business, such evidence would have no bearing on Pistotnik's criminal liability. The issue was not whether the Report's authorship would completely exonerate

---

[8] Paragraph 1 subpoenaed "all author information for [the Report]." Paragraph 2 subpoenaed "[a]ll Documents containing data collected in connection with the creation of [the Report] whether that data was submitted by the author of that report or was otherwise collected in connection with the creation or submission of such report. This includes all server logs, application logs, reports, analytics, counters, or other Documents that may contain information about either [the Report] or the user who created the report." Paragraph 3 also subpoenaed documents relating to the Report, but Pistotnik concedes that Paragraph 3 does not meet *Nixon*'s specificity requirement and does not object to the Magistrate Judge's decision to quash that request.

Pistotnik but whether it had any connection to Pistotnik's alleged crimes. The Magistrate Judge held that it did not. Nothing in the Magistrate Judge's Order indicates that the court reached this decision using an improperly narrow relevancy standard.

### 2. *Reverse 404(b) evidence*

Pistotnik argues that the Report's authorship is relevant as "reverse 404(b)" evidence. "Rule 404(b) is typically used by prosecutors seeking to rely on a criminal defendant's prior bad acts as proof of 'motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident' in the crime charged."[9] Rule 404(b), however, may also be used by defendants to introduce "evidence of wrongs, acts, or crimes . . . for defensive purposes if it tends, alone or with other evidence, to negate the defendant's guilt of the crime charged against him."[10] "Such evidence is often referred to as 'reverse 404(b).' "[11] The admissibility of reverse 404(b) evidence "depends on a straightforward balancing of the evidence's probative value against considerations such as undue waste of time and confusion of the issues."[12] In most cases the probative value of reverse 404(b) evidence will be slight "as it may just amount to pointing a finger at someone else who, having a criminal record, *might* have committed the crime the defendant is accused of committing."[13] Ordinarily, "the person against whom the evidence is being offered is not a party to the case and, therefore, will not be unfairly prejudiced if the evidence is admitted."[14]

---

[9] *United States v. Montelongo*, 420 F.3d 1169, 1174 (10th Cir. 2005).

[10] *United States v. Cook*, 2019 WL 336948, at *8 (10th Cir. 2019) (citations and quotation omitted).

[11] *Id.*

[12] *Montelongo*, 420 F.3d at 1174 (citations and quotations omitted).

[13] *Cook*, 2019 WL 336948, at *8 (citation omitted).

[14] *Rivera v. Rivera*, 262 F. Supp. 2d 1217, 1225 (D. Kan. 2003) (citation omitted).

Here, Pistotnik alleges in some detail Dorsett's *modus operandi* as a con artist, including a history of creating false negative reviews that he could then offer to remove for a price, and a history of committing email cyberattacks similar to what was alleged here. Pistotnik argues that if Dorsett was the Report's author, this would show that Dorsett targeted Pistotnik by creating a problem (posting the negative report) and then offering to fix that problem. Pistotnik theorizes that Dorsett's plan was to ingratiate himself with Pistotnik to secure a financial investment for one of Dorsett's business projects. But the events that led Dorsett to reach out to Pistotnik are merely prologue. Dorsett's authorship—assuming he was the Report's author—may offer insight into Dorsett's plans, but it has no effect on Pistotnik's alleged role in the cyberattack against Xcentric. As the Magistrate Judge correctly noted: if Pistotnik intentionally targeted Xcentric, he is still culpable even if Dorsett "baited" him into committing these crimes. Ultimately, Pistotnik's guilt or innocence must be determined by his own actions. Evidence that Dorsett created the Report has no tendency to prove that Pistotnik was not involved in the attack on Xcentric. Instead, the Court agrees with the Government's position that introducing evidence of authorship is likely to confuse the jury.

### 3. *Impeachment evidence*

Pistotnik raises a separate argument that the Report's authorship is relevant for impeachment purposes. Pistotnik asserts that after reviewing the Government's evidence, "the sole source of proof that Mr. Pistotnik sent the threats contained in Counts 1–5 are the words of David Dorsett."[15] Because Dorsett denied he was the Report's author in an interview with the FBI,

---

[15] Pistotnik also objects to the Magistrate Judge limiting his analysis of the Report's relevancy to the conspiracy charges, without discussing the relevancy of the Report's authorship to the charges in Counts 1–5. However, the Magistrate Judge was simply addressing the arguments that Pistotnik raised in his Response to the Motion to Quash. There, Pistotnik argued that proving Dorsett's authorship "tends to disprove any conspiracy." (Doc. 54 at 12). Indeed, it appears that Pistotnik's impeachment argument was never raised with the Magistrate Judge and

Pistotnik argues that evidence that Dorsett was the author could be used to impeach Dorsett, discrediting the Government's only evidence implicating Pistotnik in Counts 1–5.

Although the Government disputes Pistotnik's contention that the only direct evidence of Pistotnik's involvement in Counts 1–5 is the testimony of Dorsett,[16] this point is ultimately immaterial because "[g]enerally, prior to trial, impeachment materials may not be obtained through a Rule 17(c) subpoena because such materials fail *Nixon*'s admissibility requirement."[17] Indeed, "impeachment evidence only ripens into admissible evidence after the witness has presented direct testimony at trial."[18] The Court holds that Pistotnik cannot use Rule 17(c) to obtain documents about the Report's authorship for the sole purpose of impeaching Dorsett. Therefore, the ruling of the Magistrate Judge with respect to Paragraphs 1 and 2 of the Xcentric subpoena was not clearly erroneous.

**B.   Documentation underlying Xcentric's damages**

Paragraphs 4 and 5 of the Xcentric subpoena sought documents relating to the effects of the two cyberattacks and Xcentric's response to the attacks, including any mitigation,

---

first appeared in Pistotnik's Motion for Reconsideration. Nevertheless, the Court will now address Pistotnik's argument that the Report's authorship is relevant as impeachment evidence.

[16] The Government states that it has provided "considerable direct evidence of Pistotnik's involvement in the attacks," pointing to the following: Pistotnik emailed Dorsett a link to the Report and asked "how do we get rid of it?"; Pistotnik spoke on the phone with a representative of Jaburg Wilk, in which he denies any knowledge of the attack despite sending Dorsett the email asking how to get rid of the Report a few days earlier; Dorsett sent an invoice to Pistotnik for $2,050 for "Reputation Management" that specifically mentioned Leagle.com and Ripoffreport.com; Pistotnik then wrote a check to Dorsett for $2,050.

[17] *United States v. Wittig*, 250 F.R.D. 548, 553 (D. Kan. 2008) (citation omitted); *see also United States v. Holihan*, 248 F. Supp. 2d 179, 183 (W.D.N.Y. 2003) (citing *United States v. Hughes,* 895 F.2d 1135, 1146 (6th Cir. 1990)) ("Evidence sought only to impeach a government witness, however, is not subject to production by a third party in response to a Rule 17(c) subpoena."); *United States v. Cherry*, 876 F. Supp. 547, 553 (S.D.N.Y. 1995) ("[D]ocuments are not evidentiary for Rule 17(c) purposes if their use is limited to impeachment.").

[18] *Wittig*, 250 F.R.D. at 554.

troubleshooting, investigatory, or remedial steps they took. The Magistrate Judge denied the motion to quash Paragraphs 4 and 5, stating:

> The Court reads [Paragraphs] 4 and 5 as seeking documentation underlying Xcentric's claimed damages. [Pistotnik] has included a copy of Xcentric's invoice for $72,261.50 in its responsive brief. . . . [Pistotnik] is now merely requesting backup information on this particular invoice. The underlying documentation of the victim's damages is relevant—and to the extent that [Paragraphs] 4 and 5 intend to seek such documents, the requests are relevant.

The Magistrate Judge, however, granted the motion to quash Paragraphs 10 and 12–14. Pistotnik argues that Paragraphs 10 and 12–14 relate to Xcentric's damages and should therefore be treated as subsets of Paragraphs 4 and 5, which the Magistrate Judge did not quash. Thus, Pistotnik argues that it was clearly erroneous for the Magistrate Judge to deny the motion to quash Paragraphs 4 and 5 but then grant the motion to quash Paragraphs 10 and 12–14.

*1.  Paragraph 10*

In Paragraph 10 Pistotnik subpoenaed documents "that Refer To the line items shown on [Xcentric's invoice for $72,261.50] including any explanation of what each item consisted of or how the dollar amount associated with each item was calculated." The Court agrees with Pistotnik that the Magistrate Judge's ruling on Paragraphs 4 and 5 would logically dictate compliance with Paragraph 10. It is unclear why the Magistrate Judge grouped Paragraph 10 with Paragraphs 12–14, which subpoena documents relating to Xcentric's cyber-defenses. Regardless, the Court sets aside the Magistrate Judge's ruling on Paragraph 10 but with two additional comments. First, Paragraph 10 is sufficiently intertwined with what Xcentric was ordered to produce under Paragraphs 4 and 5 that Xcentric may very well have complied with Paragraph 10 despite it being quashed. In fact, in response to the Magistrate Judge's order, Xcentric produced additional invoices explaining at least one of the line items in Xcentric's invoice. And second, Pistotnik has

filed a motion to compel (Doc. 79), in which he argues that Xcentric failed to fully comply with the Magistrate Judge's order that Xcentric produce documents explaining Xcentric's invoice for $72,261.50. At the request of all interested parties, the Court is holding Pistotnik's motion to compel in abeyance, allowing the parties to negotiate a mutually agreeable resolution. The Court anticipates that the parties' negotiations on Pistotnik's motion to compel would naturally address Xcentric's compliance with Paragraph 10.

   *2.     Paragraphs 12–14*

In Paragraphs 12–14, Pistotnik subpoenaed documents regarding Xcentric's cyber-defenses. The Magistrate Judge granted the motion to quash these categories for two reasons. First, the Magistrate Judge found such information to be irrelevant because comparative fault is not a defense to the alleged crimes, so any weaknesses in Xcentric's system would not excuse Pistotnik's actions. Second, the Magistrate Judge concluded that Pistotnik's broad language made the subpoena "read like standard documents requests sent in civil discovery," but since Rule 17 cannot be used as a discovery device in criminal cases the request failed *Nixon*'s specificity requirement. Pistotnik argues in response that Paragraphs 12–14 relate to Xcentric's damages; thus, Paragraphs 12–14 are simply subsets of Paragraphs 4 and 5 that the Magistrate Judge did not quash.

Upon review of Paragraphs 12–14, the Court holds that the Magistrate Judge's decision to quash these paragraphs was not clearly erroneous. Pistotnik's subpoena seeks information about Xcentric's cyber-defenses that appear to be more detailed than is necessary to prove Xcentric's damages, which remains the only basis for the information's relevance in this case. As the Court alluded to at the May 6 hearing, the correct resolution to this dispute is likely a compromise between what Pistotnik has requested and what Xcentric has provided. In the same way that

Pistotnik is entitled to documents demonstrating a nexus between Xcentric's claimed $72,261.50 in damages but is not entitled to know every detail of Xcentric's post-attack security upgrades, Pistotnik is also entitled to evidence that his alleged actions were capable of compromising Xcentric's computer systems even if he is not entitled to every detail of Xcentric's prior cyber-defenses.

Considering the breadth of Pistotnik's request for documents in Paragraphs 12–14, it was not clearly erroneous for the Magistrate Judge to grant the motion to quash on relevancy grounds. Nevertheless, the Court recognizes that there is likely some overlap between what was requested in Paragraphs 12–14 and the proof of damages that Xcentric is required to produce under Paragraphs 4 and 5. As discussed above, the Court is withholding its ruling on Pistotnik's motion to compel compliance with Paragraphs 4 and 5 to allow the parties to negotiate an acceptable compromise. Although the Court does not find clear error with the Magistrate Judge's order granting the motion to quash Paragraphs 12-14, the Court anticipates that aspects of Paragraphs 12–14 may be relevant to demonstrating that Xcentric was actually harmed by Pistotnik's alleged crimes and would therefore need to be produced pursuant to Paragraphs 4 and 5. Thus, as the parties seek their own resolution on Pistotnik's motion to compel, the Court encourages the parties to find an acceptable resolution on these issues as well. Otherwise, when ruling on Pistotnik's motion to compel compliance with Paragraphs 4 and 5, the Court will revisit this issue to determine how much of Xcentric's cyber-defenses must be revealed to Pistotnik to adequately demonstrate Xcentric's claim of damages.

## C.     Pistotnik's compliance with Rule 17(c)(3)

Pistotnik has a valid objection to the Magistrate Judge's determination that Pistotnik blatantly disregarded Rule 17. Rule 17(c)(3) states that "a subpoena requiring the production of

personal or confidential information about a victim may be served on a third party only by court order."[19] On September 19, 2018, Pistotnik filed a motion with the Court to issue his subpoenas to Xcentric and Chandler (Doc. 36); the Court contacted Pistotnik's counsel by telephone to inform counsel (erroneously) that the motion was unnecessary and that he could proceed. It is clear that Pistotnik intended to comply with Rule 17's requirement that his subpoenas be issued with the Court's permission. It is equally clear that the Court, not Pistotnik, is responsible for any procedural shortcomings in this matter. As such, the Court concludes that any portion of the Magistrate Judge's order granting the motion to quash that relied exclusively on Pistotnik's noncompliance with Rule 17 should be set aside.

Here, the Magistrate Judge noted that the Motion to Quash did not specifically address Paragraphs 9, 11, and 15 in the subpoena to Xcentric or Paragraphs 1–4 and 6 in the subpoena to Chandler. The Magistrate Judge noted that typically he "would find that a movant waived its objections to categories of requested documents not discussed in a motion to quash a subpoena." However, the Magistrate Judge granted the motion to quash these paragraphs because of Pistotnik's perceived noncompliance with Rule 17(c)(3). Because Xcentric never objected to or discussed Paragraph's 9, 11, and 15, and because the only basis for granting the motion to quash was the Rule 17 issue, the Court sets aside that portion of the Magistrate Judge's order. For the same reason, the Court also sets aside the Magistrate Judge's order granting the motion to quash Paragraphs 1–3 in the subpoena to Chandler.

The Court does not, however, set aside the order quashing Paragraphs 4 and 6 of the Chandler subpoena. Granted, Chandler's motion to quash did not specifically mention Paragraphs

---

[19] Fed. R. Crim. P. § 17(c)(3).

4 and 6. But Paragraphs 4 and 6 in the Chandler subpoena—as well as Paragraph 5, which Chandler did address in his motion to quash—are essentially the same as Paragraphs 12–14 in the Xcentric subpoena, seeking information about Xcentric's cyber-defenses. Additionally, Xcentric and Chandler's motion to quash specifically addressed Xcentric's objections to Paragraphs 12–14, stated that the subpoena to Chandler carried many of the same dangers as the subpoena to Xcentric, and requested that the entire subpoena to Chandler be quashed. Accordingly, the Court concludes that Paragraphs 4 and 6 were sufficiently addressed in Chandler's motion to quash. Furthermore, as the Court discussed above in its ruling on Paragraphs 12–14 in the Xcentric subpoena, Pistotnik is entitled to evidence that his alleged actions caused Xcentric's claimed damages, but he is not entitled to know every detail about Xcentric's cyber-defenses. The same flaws that are present in Paragraphs 12–14 in the Xcentric subpoena are also present in Paragraphs 4–6 in the Chandler subpoena. So, for the same reasons the Court denied Pistotnik's request to set aside the Magistrate Judge's order on Paragraphs 12–14 to Xcentric, Pistotnik's request to set aside the order quashing Paragraphs 4–6 is also denied.

### D. Chandler subpoena Paragraphs 7 and 8

Having already addressed Paragraphs 1–6 of the Chandler subpoena, only Paragraphs 7 and 8 remain to be considered. Turning first to Paragraph 7, Pistotnik argued at the May 6 hearing that because Paragraph 7 in the Chandler subpoena is similar to Paragraph 15 in the Xcentric subpoena, the Court's ruling on Paragraph 15 should dictate the Court's ruling on Paragraph 7. The Court discerns two problems with that approach. First, the reason Xcentric has been ordered to comply with Paragraph 15 is because Xcentric's motion to quash never objected to that portion of the subpoena, whereas Chandler did object to Paragraph 7. And second, Paragraph 15 in the Xcentric subpoena is a much narrower request than Paragraph 7 in the Chandler subpoena.

Paragraph 15 sought "[a]ll mail server or emailed-related log, reports, data, or analytics that Refer To the emails received by ripoffreport.com at the time of the First Attack or the Second Attack. The Court reads Paragraph 15 as requesting documents relating to the content and quantity of emails that were sent to Ripoffreport in the "email bomb."  If Xcentric's computer systems were compromised and damaged because Xcentric was bombarded with a large quantity of emails, then Pistotnik is entitled to documents explaining the number of emails Xcentric received.  That is why Paragraph 15 is relevant.

By comparison, Paragraph 7 in the Chandler subpoena sought "[a]ll mail server or email-related logs, reports, data, or analytics that Refer To email or web traffic received by Xcentric Ventures, LLC, Ed Magedson, or RipOffReport.com in September of 2014 or July of 2015." Paragraph 7 is not limited to just the emails sent to RipOffReport.com during the two attacks. Rather, Paragraph 7 broadly seeks all documents relating to emails *and web traffic* for the entire months of September 2014 and July 2015.  As such, Paragraph 7 goes beyond seeking relevant documents and instead resembles an impermissible fishing expedition.  For that reason, the Court holds that Paragraph 7 in the Chandler subpoena should remain quashed.

Finally, the Court considers Paragraph 8, where Pistotnik subpoenaed "[c]heck stubs, transaction records, and other backup for any payments [Chandler] received from Xcentric Ventures, LLC, Ed Magedson, or RipOffReport.com related to either the First Attack or the Second Attack."  Chandler's Motion to quash argued that some of the invoices it sent to Xcentric contained information about Chandler's security infrastructure that could compromise both Chandler and Xcentric's security if exposed to the public or the Defendants.

The Court holds that Paragraph 8 is relevant to determining Xcentric's damages. Chandler's concern with Paragraph 8 appears to be the same issue that Xcentric raised in response

to Pistotnik's motion to compel compliance with Paragraphs 4 and 5. The Magistrate Judge ordered Xcentric to produce documentation explaining its claim of $72,261.50 in damages, and Xcentric responded by providing several heavily redacted invoices. The redactions were intended to protect the precise details of Chandler and Xcentric's security infrastructure, but Pistotnik argued in his motion to compel that the redactions rendered the invoices mostly useless. The Court is postponing its ruling on the motion to compel to give the parties an opportunity to reach a compromise. Presumably, any compromise would give Pistotnik enough information to determine that Xcentric's expenses were caused by Pistotnik's alleged crimes but without endangering Xcentric or Chandler's systems to further attack. It is the Court's impression that any compromise the parties reach with regard to Pistotnik's motion to compel would also apply to Paragraph 8. The Court does not expect Chandler and Xcentric to expose its entire digital infrastructure, but the Court holds that Pistotnik is entitled to the financial documents subpoenaed in Paragraph 8 to show that Xcentric suffered actual harm from the alleged attack.

## IV. Conclusion

Defendant Pistotnik's Motion for Reconsideration is granted in part and denied in part. Specifically, the Court grants the request to set aside the Magistrate Judge's order quashing Paragraphs 9, 10, 11, and 15 of Pistotnik's subpoena served on Xcentric and Paragraphs 1, 2, 3, and 8 of Pistotnik's subpoena served on Chandler. The Court denies the request to set aside the Magistrate Judge's ruling on Paragraphs 1, 2, 12, 13, and 14 of the Xcentric subpoena and Paragraphs 4, 5, 6, and 7 of the Chandler subpoena.

**IT IS THEREFORE ORDERED** that Pistotnik's Motion to Reconsider (Doc. 71) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED**.

Dated this 23rd day of May, 2019.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE